EAG/JDG/CMP
F.#2008R00530

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

                            08 CR 240 (S-6)(BMC)

DINO SARACINO,

           Defendant.

- - - - - - - - - - - - - - - - -X


**THE GOVERNMENT'S SENTENCING MEMORANDUM**


                                     LORETTA E. LYNCH
                                       United States Attorney
                                       Eastern District of New York
                                       271 Cadman Plaza East
                                       Brooklyn, New York 11201


Elizabeth A. Geddes
James D. Gatta
Cristina M. Posa
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

Pursuant to 18 U.S.C. § 3553(a), the government respectfully submits that the only appropriate sentence for the defendant Dino Saracino is the maximum sentence permitted under the law: a sentence of 100 years.  For the reasons stated below, the relevant factors in 18 U.S.C. § 3553(a) support the imposition of this term of incarceration, which would imprison Saracino for the remainder of his life.

I.   <u>Background</u>

Saracino was convicted of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); extortionate extension of credit conspiracy, in violation of 18 U.S.C. § 892(a) (Count Five); prevention of testimony, in violation of 18 U.S.C. § 1512(b)(1) (Count Six); withholding of testimony and records, in violation of 18 U.S.C. § 1512(b)(2)(A) (Count Seven); and obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Eight).  With respect to Count One, as to Saracino, the jury found proven Racketeering Act Three (murder conspiracy - Orena faction members); Racketeering Act Seven (extortionate collection of credit – Peter Risk); Racketeering Act Twelve (murder conspiracy – Michael Burnside); Racketeering Act Fourteen (extortionate extension of credit conspiracy); and Racketeering Act Sixteen (witness tampering – David Gordon); it did not find proven Racketeering Act Eight (robbery/robbery conspiracy – Chemical Bank); Racketeering Act Nine (murder/murder

conspiracy - Richard Greaves); Racketeering Act Ten (cocaine distribution conspiracy); Racketeering Act Eleven (murder/murder conspiracy - Ralph Dols); Racketeering Act Thirteen (murder/murder conspiracy - William Cutolo) and Racketeering Act Fifteen (extortion – Johnny Cash).  Saracino was acquitted of the murder in-aid-of racketeering of Richard Greaves (Count Two), the murder in-aid-of racketeering of Ralph Dols (Count Three) and the murder in-aid-of racketeering of William Cutolo (Count Four).  A detailed recitation of the evidence adduced at trial is included in the government's motion in opposition to Saracino's and Thomas Gioeli's motions for a judgment of acquittal and a new trial and the government's response to Saracino's objections to the Pre-Sentence Investigation Report ("PSR"), and are incorporated here by reference.  (Gov't Resp. In Opp. to Def'ts' Mot. for Judgment of Acquittal and New Trials, dated Aug. 17, 2012 (ECF Docket Entry No. 1631) ("Gov't's Br."); Ltr. from Gov't to U.S. Probation Officer Houlton, dated Mar. 29, 2013).

II.  The Court Should Impose the
     <u>Maximum Incarceratory Sentence on Saracino</u>

As set forth below, a consideration of the scope of Saracino's grave crimes, the applicable sentencing Guidelines range, as well as the factors set forth in 18 U.S.C. § 3553(a) all support the maximum possible incarceratory sentence for Saracino.

A.   The Defendant Should Be Held
     Accountable for Relevant Conduct

As set forth below, Saracino's participation in the
murders of Joseph Scopo, Richard Greaves, Ralph Dols and William
Cutolo constitutes "relevant conduct" as that term is defined in
the Sentencing Guidelines.  The government submits that the trial
evidence, supplemented by the evidence set forth herein, proved
the defendant's accountability for each of those murders by at
least a preponderance of the evidence.[1]

1.   Legal Standard

The Second Circuit has held that "disputed facts
relevant to sentencing, even under the Guidelines, need be
established only by a preponderance of the evidence."  United
States v. Concepcion, 983 F.2d 369, 388 (2d Cir. 1992); see also
United States v. Gigante, 94 F.3d 53, 55 (2d Cir. 1996)
("[U]nconvicted conduct may be relied upon to adjust a
defendant's sentence level as contemplated by the Guidelines

---

[1]   The government further submits that Saracino's
participation in the violent extortionate collection of credit
from an individual known as "Peter Risk" (PSR ¶ 54), the robbery
of Chemical Bank (PSR ¶¶ 55-58), the conspiracy to distribute
cocaine (PSR ¶¶ 63-64), the extortion of an individual known as
"Johnny Cash" (PSR ¶¶ 84-85), and the litany of robberies,
burglaries and thefts (PSR ¶¶ 92-95) also constitute relevant
conduct as to Saracino.  Because none of these crimes affects the
calculation of Saracino's applicable Guidelines sentencing range,
the government will not further elaborate on the extensive
evidence of Saracino's participation in these crimes, which was
adduced at trial and in the PSR.

based on proof by a preponderance of the evidence."). In making factual findings under the Sentencing Guidelines, the "sentencing court remains entitled to rely on any type of information known to it." Concepcion, 983 F.2d at 388; see also United States v. Franklyn, 157 F.3d 90, 97 (2d Cir. 1998).

Under the Sentencing Guidelines, the Court must consider all relevant conduct whether or not it resulted in a conviction. See U.S.S.G. § 1B1.3. Conduct relevant to a racketeering conviction includes all conduct reasonably foreseeable to the defendant in furtherance of the racketeering enterprise. See United States v. Ruggiero, 100 F.3d 284, 292 (2d Cir. 1996); United States v. Ayala, 75 F. Supp. 2d 126, 129-30 (S.D.N.Y. 1999); United States v. Santiago, 413 F. Supp. 2d 307, 320-321 (S.D.N.Y. 2006) (noting that district court could take into account defendant's conduct with respect to death of drug addict, and other acts of violence that were supported at trial by a preponderance of the evidence, as relevant aggravating circumstances both for determining length of appropriate sentences for crimes of conviction, participating in racketeering conspiracy and in narcotics conspiracy to distribute crack cocaine and for deciding that the totality of the circumstances pertaining to those offenses warranted consecutive, rather than concurrent, sentences). Thus, underlying predicate racketeering acts – even if found not proven by the jury – qualify as relevant conduct. See United States v. Carrozza, 4 F.3d 70 (1st Cir.

4

1993); see also United States v. Thai, 29 F.3d 785, 820 (2d Cir.
1994); see, e.g., United States v. Upshaw, 114 Fed. Appx. 692, 17
(6th Cir. 2004) ("[I]n calculating the base offense level for a
RICO conspiracy conviction under the Sentencing Guidelines,
underlying racketeering activity is relevant conduct for the
purposes of the sentencing guidelines and need only be proven by
a preponderance of the evidence.").

    Next, it is well settled that charges that do not
result in a conviction, including even acquitted conduct, can be
taken into account at sentencing.  See United States v. Massino,
546 F.3d 123, 135 (2d Cir. 2008); United States v. Watts, 519
U.S. 148, 149-57 (1997); Nichols v. United States, 511 U.S. 738,
747 (1994); United States v. Singh, 390 F.3d 168, 191 (2d Cir.
2004).  In United States v. Massino, the Second Circuit upheld
the district court's determination that the defendant DeFilippo's
commission of a murder, which the jury found the government
failed to prove at trial, was relevant conduct for his RICO
conspiracy conviction and affirmed the district court's sentence
of 40 years' imprisonment.  546 F.3d at 135 ("When the offense of
conviction is a RICO conspiracy, relevant conduct may include
'underlying predicate acts,' even if not proven at trial beyond a
reasonable doubt, as long as the sentencing court finds that they
were proven 'by the lower preponderance of the evidence
standard.'").  Similarly, in United States v. Watts, 519 U.S. at
156-57, the Supreme Court held that sentencing courts have broad

5

discretion in considering various kinds of information, and the jury cannot be said to have "necessarily rejected" any facts when it returns a verdict of not guilty.  <u>Id.</u> at 150, 155 (quotation omitted).

"In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."  <u>Id.</u> at 152 (citing U.S.S.G. § 1B1.4).[2]  Thus, "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."  <u>Id.</u> at 153 (quoting U.S.S.G. § 1B1.3, cmt. background).  "Relying on the entire range of conduct, regardless of the number of counts that are alleged or

_____

[2]  Courts remain free following <u>United States v. Booker</u>, 543 U.S. 220 (2005), and <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), to rely upon acquitted conduct in their sentencing determinations.  <u>See</u> <u>United States v. Vaughn</u>, 430 F.3d 518, 527 (2d Cir. 2005) (holding that after <u>Booker</u>, district courts "may continue to find facts relevant to sentencing by a preponderance of the evidence . . . [and] may also continue to take into account acquitted conduct when sentencing defendants without violating the Due Process Clause"); <u>see</u> <u>also</u> <u>United States v. Florez</u>, 447 F.3d 145, 156 (2d Cir. 2006) (concluding that after <u>Booker</u>, a district court may continue to make its own preponderance finding of a higher drug quantity than the amount found by the jury); <u>United States v. Agostini</u>, 365 F. Supp. 2d 530, 534 (S.D.N.Y. 2005) (quoting <u>United States v. Crosby</u>, 397 F.3d 103, 112 (2d Cir. 2005)); <u>Crosby</u>, 397 F.3d at 112 ("with the mandatory nature of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection").

on which a conviction is obtained, appears to be the most reasonable approach to writing workable guidelines for these offenses." Id. (quoting U.S.S.G. § 1B1.3, cmt. background).

In Watts the Supreme Court highlighted "the significance of the different standards of proof that govern at trial and sentencing," explaining that "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." Id. at 155 (quoting United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984)).  The Watts Court held:

> [I]t is impossible to know exactly why a jury found a defendant not guilty on a certain charge.  "[A]n acquittal is not a finding of any fact.  An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt.  Without specific jury findings, no one can logically or realistically draw any factual finding inferences . . . ."

Id. (quoting United States v. Putra, 78 F.3d 1386, 1394 (9th Cir. 1996) (dissenting opinion)).  In sum, for the purpose of sentencing, the Court need only find the defendant's involvement in the alleged murders by a preponderance of the evidence – a standard clearly met here.

Furthermore, the Guidelines provide that consecutive sentences are warranted when necessary to achieve the applicable Guidelines range.  See U.S.S.G. § 5G1.2(c)-(d).  Moreover, the Second Circuit has expressly approved of the imposition of

consecutive sentences for a RICO conviction as well as a conviction for an underlying predicate offense.  United States v. Thomas, 757 F.2d 1359, 1369-70 (2d Cir. 1985).  See also United States v. Matera, 489 F.3d 115, 123-24 (2d Cir. 2007) (upholding imposition of 70-year term of imprisonment, as sentence within the Guidelines range, as reasonable where "[t]he district court considered the § 3553(a) factors, finding that '[t]he defendant has repeatedly shown his willingness to murder other human beings as part of his membership in an ongoing and widespread criminal enterprise, and his criminal history unmistakably demonstrates that he is unlikely to lead a law-abiding life if released from custody" and that "[o]nly the maximum penalty that the law permits is sufficient in this case.").  Indeed, one court observed, "we conclude that Congress clearly intended to permit, and perhaps sought to encourage, the imposition of cumulative sentences for RICO offenses and the underlying crimes."  United States v. Kragness, 830 F.2d 842, 864 (8th Cir. 1987).

> 2. The Defendant's Accountability for the Murder of Joseph Scopo Is Established by a Preponderance of the Evidence

As an initial matter, as the government asserted in its response to Saracino's objections to the PSR, the government submits that Saracino should be held responsible for the murder of Joseph Scopo, a casualty of the Colombo crime family war in which Saracino participated, as that murder was reasonably foreseeable to Saracino and constitutes relevant conduct.  The

8

jury found proven Racketeering Act Three, the predicate racketeering act alleging that Saracino, who was part of the faction of the crime family loyal to incarcerated boss Carmine Persico (the "Persico faction"), conspired to kill crime family members loyal to acting boss Victor Orena.  At trial, Dino Calabro and Joseph Competiello variously testified that during the Colombo crime family war, Saracino was a member of the Persico faction; that Scopo, a member of the faction loyal to then-acting boss Victor Orena, was identified as a prime target during the war between the two factions; and that Saracino and others conducted surveillance of Scopo in connection with the war.  (See PSR ¶¶ 35, 38; T. 1017-19, 1038-39 (Calabro's testimony), 2062-64 (Competiello's testimony)).  Scopo was ultimately murdered on October 20, 1993, outside of his Queens residence, by members of the Persico faction.  There is no dispute that Saracino did not participate directly in the Scopo murder.  However, the murder was in furtherance of the conspiracy to murder members of the Orena faction and was reasonably foreseeable to Saracino, and accordingly constitutes relevant conduct for which he should be held accountable.

A preponderance of the evidence supports that Scopo was murdered by members of the Persico faction, of which Saracino was part.  Although no such evidence was adduced at Saracino's trial, at a minimum, two guilty plea proceedings and evidence adduced in two separate trials in this courthouse have established by a

preponderance of the evidence that Theodore Persico, Jr., Anthony Russo, Eric Curcio, Francis Guerra, John Pappa and John Sparacino, together with others, all of whom were allied with the Persico faction, murdered Scopo as part of the Colombo crime family war.  Specifically, in May 2011, Anthony Russo pleaded guilty to racketeering conspiracy, including the Scopo murder as a predicate racketeering act.[3]  (United States v. Russo, Crim. Docket No. 11-30 (KAM)).  In June 2012, Theodore Persico, Jr., a nephew of Carmine Persico, waived statute of limitations and pleaded guilty to a conspiracy to murder Scopo in-aid-of racketeering in connection with his role in the murder.  (United States v. Persico, Crim. Docket No. 10-147 (SLT) (ECF Docket Entry No. 563)).  In 1999, Pappa was convicted after trial of racketeering conspiracy, including the Scopo murder as a predicate racketeering act.  (United States v. Pappa, Crim. Docket No. 97-1005 (RJD) (ECF Docket Entry No. 175)).  More recently, in 2012, Guerra was also tried on charges of racketeering conspiracy, including the Scopo murder as a racketeering act.  Among other evidence admitted at trial, Russo testified that Guerra participated in the Scopo murder as part of the Colombo crime family war.  (A copy of the relevant excerpts

---

[3]  In his allocution, Anthony Russo admitted, "[i]n or about 1993, in Brooklyn, I agreed to help other people kill Joey Sc[o]po, who was a member of the Colombo Crime Family [, and] [i]n or about October 20, 1993, I participated in the murder with other people by driving them to the scene, knowing their intent when they arrived was to kill Sc[o]po."

of Russo's testimony in <u>United States v. Guerra</u>, Crim. Docket No. 10-147 (SLT), is enclosed as Exhibit A).  Although Guerra was acquitted of the racketeering conspiracy charge, the evidence adduced at the trial was more than sufficient to establish by a preponderance of evidence that Scopo was in fact murdered by members of the Persico faction.  <u>See</u> <u>United States v. Carmona</u>, 873 F.2d 569, 574 (2d Cir. 1989) (sentencing court entitled to rely on any type of information known to it, including testimony from trial in which person to be sentenced was not a defendant).

In light of the testimony elicited at Saracino's trial about the Colombo crime family war and Saracino's personal participation in the surveillance of Scopo, and the facts set forth above, the government has established by at least a preponderance of evidence that the Scopo murder was in furtherance of the conspiracy to murder members of the Orena faction and was reasonably foreseeable to Saracino.  Accordingly, the murder of Scopo constitutes relevant conduct under U.S.S.G. § 1B1.3.

11

3.   The Government Proved Saracino's
     Involvement in the Greaves Murder by
     <u>at Least a Preponderance of the Evidence</u>

Saracino should be held accountable for his participation in the 1995 murder of Richard Greaves, because the government proved Saracino's participation by at least a preponderance of the evidence.  Saracino fatally shot Greaves and assisted in disposing of Greaves's body on August 3, 1995.  At trial, the government proved Saracino's involvement in the Greaves murder through the testimony of four cooperating witnesses, including Saracino's own brother, three of whom participated in Greaves's murder and identified Saracino as the shooter, and also through Saracino's own admissions on remarkably inculpatory consensual recordings.  Additional evidence, including statements made by a coconspirator to another cooperating witness, also implicates Saracino in the murder. Some of this evidence is set forth below.

a.   <u>Evidence of the Greaves Murder</u>

In February 2008, David Gordon advised the government (as he testified at trial) that Saracino had admitted to him at a bar in the mid-1990s that he and the Gioeli crew "did Richie in the dungeon," a reference to the Saracino family basement on 74th Street in Brooklyn.  (T. 3433).  Thereafter, other witnesses independently provided accounts of Saracino's participation in this homicide.  On September 30, 2008, at his first proffer session with the government, Joseph Competiello advised that

12

Saracino shot Greaves with a .38 caliber gun in the Saracino basement in the presence of Gioeli and others.  (See T. 2145). Saracino's cousin, Dino Calabro, and Saracino's brother Sebastian Saracino thereafter provided chilling accounts of Gioeli and Saracino's participation in the murder.  (T. 1109 and 1112-13 (Calabro's testimony), 4281-82 and 4314-16 (Sebastian Saracino's testimony)).  Competiello, Calabro and Sebastian Saracino also testified that they then cleaned up the murder scene, transported Greaves's body to a burial site on Long Island and brought the Jeep in which Greaves drove to Saracino's apartment to a location in the vicinity of the Verrazano bridge.  (T. 1113-20 (Calabro's testimony), 2146-50 (Competiello's testimony), 4316-19 (Sebastian Saracino's testimony)).

Sebastian Saracino's testimony is particularly compelling given the brothers' relationship.  As numerous witnesses have confirmed, Sebastian Saracino's role in the mafia was relatively limited.  Although Sebastian Saracino, together with his brother Dino Saracino, was inducted as a soldier into the Colombo crime family in 2003, by all accounts, it was Dino Saracino – not Sebastian Saracino – who held the lifelong dream of becoming an inducted member of the Colombo crime family. Indeed, by the time of his induction ceremony, Sebastian Saracino had moved to California and agreed to return to Brooklyn to be initiated only because Saracino urged him to do so – as Saracino put it, "if you don't take it, somebody else will on the other

13

side" (i.e., the Orena side).  (T. 4361).  This statement shows
Saracino's abiding commitment to both the Colombo family and, in
particular, the Persico faction.

When Sebastian Saracino was arrested in February 2010,
he was charged with making false statements to immigration
authorities.  (T. 4356).  Yet he readily pleaded guilty to his
participation in the Greaves murder, among other crimes, and as a
result, is now facing a possible life sentence.  His disaffection
with the mafia life had chosen was made clear during cross
examination by counsel for Saracino:

> Q:  What is it that you hope at the end of
> the day that that [5K1.1] letter will do
> for you as it relates to your sentence?
>
> A:  What am I hoping?
>
> Q:  What is your understanding?  Why would
> you sign such a letter?  Why would you
> sign such an agreement with the
> government to get such a letter?  What
> is your hope at the end of the day?
>
> A:  Only thing that I know is that the
> letter is going to have the good and all
> the bad crimes that I have committed.
> As far as hope, I feel like my hope went
> out the window when I participated with
> Richard Greaves murder.

(T. 4458).  Although the jury did not find proof beyond a
reasonable doubt, it is hard to imagine why Sebastian Saracino
would expose himself to a possible life sentence (or, initially,
the death penalty) by fabricating his and his brother's
participation in Greaves's murder.

14

Moreover, Gordon, Competiello, Calabro and Sebastian Saracino's accounts of Greaves's murder are also corroborated by the testimony of several non-cooperating witnesses.  For example, Sandra Tullo - Greaves's girlfriend of two years - testified that Greaves disappeared on August 3, 1995 and that on the day of his disappearance, Greaves asked to borrow her car, a blue Jeep, and that the Jeep was recovered by the Verrazano Bridge a few days after Greaves's disappearance, in the vicinity of where Competiello and Calabro testified the coconspirators in the murder left the Jeep.  (T. 1115 (Calabro's testimony that Competiello and Saracino left Tullo's Jeep at the side of the [Brooklyn Queens Expressway], near - between 92nd Street and 86th Street[,]") 2148 (Competiello's testimony that Calabro and Saracino left Tullo's Jeep at the Verrazano bridge in Bay Ridge, Brooklyn), 4319 (Sebastian Saracino's testimony that Anthony Calabro moved Tullo's Jeep to "New Utrecht Avenue [and] 17th Avenue somewhere")).[4]  Dennis Basile testified that sometime after May 1995, Greaves and he decided to open up a restaurant in Phoenix, Arizona[5] and that Greaves invested money in the

---

[4]  The last exit of the Brooklyn Queens Expressway before the Verrazano Bridge is 92nd Street.

[5]  Competiello, Calabro and Sebastian Saracino also testified that Greaves planned to move away from New York following the robbery of the Chemical Bank, which took place on June 5, 1995.  (T. 1107 (Calabro's testimony), 2140 (Competiello's testimony), 2757 (Competiello's testimony), 4297 (Sebastian Saracino's testimony)).

restaurant, but that Greaves never moved to Arizona as planned and never attempted to recoup the money he invested. (T. 3348-52).

In addition, the cooperating witnesses' accounts are corroborated in significant part by Saracino's reaction to a subpoena served on his brother Sebastian Saracino in May 2008, which was captured on consensual recordings made by David Gordon. (T. 3045-46 (Gordon's testimony)). Unbeknownst to Gordon, while Saracino and Gordon traveled to Florida in May 2008, FBI agents left a voicemail message on Saracino's brother's residence in California that they knew about his participation in "cleaning up with Richie." (GX 601). Upon learning of this information, Saracino frantically tried to make sense of the voicemail message and made a series of inculpatory statements about the murder to Gordon.

First, Saracino admitted in no uncertain terms his participation in murders:

> SARACINO:        Yeah, they're wondering how we got through the cracks.
>
> GORDON:          What cracks, big guy?
>
> SARACINO:        All these homicides and all

(GX 501T(e) at 3). Later that night, Saracino observed:

> SARACINO:        There's a big time informant. I can't figure it out.
>
>                  *    *    *

16

SARACINO:       Did my brother Frankie have a big mouth?

GORDON:         In what way, D?

SARACINO:       Did he tell a lot of secrets?

GORDON:         To me, D?

SARACINO:       Honestly.

GORDON:         I'm being honest with you D, to me, he never told me anything.  Listen, D, I love you to death, he never once said anything.  I mean, I was pretty close with him D, I mean, I mean, I guess Greggie, you know, might have been closer, you know, Squirts I guess, could, whatever, but he never said, you know.  We were alone a lot, you know, we talked, you know, what I'm saying?

SARACINO:       [UI]

GORDON:         He never, Frankie wasn't like that D.

SARACINO:       I know, I remember.

GORDON:         He wasn't like that at all, I mean.  You know.

SARACINO:       You think Nooch is an informant?

GORDON:         You know.  Come on, D.  D, don't let them fucking rattle you right now, D.  Come on, it's your cousin.  D.

SARACINO:       I'm just saying.

GORDON:         I know, but D, whatever news you got right now, calm, I mean, I don't mean to say calm

17

|  | down, but let it come in, let it, you know what I'm saying? D, they can fucking, do what they want the government, you know what I'm saying? |
|---|---|
| SARACINO: | It don't make sense.  [UI]. |
| GORDON: | Can't be from your brother. |
| SARACINO: | What? |
| GORDON: | It can't be anything from your brother, D.  You know that? |
| SARACINO: | Why? |
| GORDON: | What do you mean why, D?  Your brother is gone 10 years, big guy. |
| SARACINO: | [UI]. |
| GORDON: | Huh? |
| SARACINO: | [UI]. |
| GORDON: | I don't know, D. |
| SARACINO: | Joe Caves, maybe? |
| GORDON: | Come on, D, what are you fucking crazy, D?  Calm down. I wouldn't think so. |

(GX 501T(f) at 3-4).  (Copies of excerpts of these recordings are
enclosed on Exhibit B in files respectively named "All the
homicides.wav" and "Big time informant.wav".)  At trial, evidence
established that each of the individuals whom Saracino feared may
have become an informant – his "brother Frankie" (Frank
Saracino), "Nooch" (Anthony Calabro, Saracino's cousin and
Calabro's brother) and "Joe Caves" (Competiello) – were all

18

present for the Greaves murder and/or the cleanup and could therefore implicate Saracino in that homicide.  (T. 1117, 4314).

Finally, in a consensual recording made on December 14, 2010, which was not presented at trial, Dino Calabro's brother Anthony Calabro admitted to Colombo crime family associate (and defense witness) Thomas McLaughlin, who was wearing a recording device because he was cooperating with the government at that time, what happened during the Greaves murder.  Corroborating Calabro and Competiello's trial testimony, Anthony Calabro told McLaughlin that Competiello greeted Greaves when Greaves arrived at the Saracino residence and that Gioeli, Saracino and Calabro were inside waiting for him.  The following is a transcript of an excerpt of the recording:

> MCLAUGHLIN:      And Dino [Saracino] and his
>                  brother [Sebastian Saracino]
>                  were waiting for him in the
>                  house.  His brother was
>                  waiting for him in the house.
>
> A. CALABRO:      All of them.  They were all
>                  waiting.  There were sitting
>                  down.  They were hanging out.
>                  Little D- [Dino Saracino]
>
> MCLAUGHLIN:      Uh huh
>
> A. CALABRO:      Joe Caves [Competiello] and
>                  Tommy [UI] [Gioeli]

(A copy of an excerpt of the recording is enclosed with this brief on Exhibit B in a file named "His brother was waiting.wav".)  McLaughlin also advised the government that following the arrest of Gioeli, Calabro and Competiello, Saracino

19

admitted to McLaughlin that "we" – Gioeli's crew – were
responsible for the Greaves murder.  (A copy of an FBI report
documenting Saracino's admission to McLaughlin is enclosed as
Exhibit C.)

In light of the above, and all the evidence adduced at
trial, Saracino's participation in the Greaves murder was proven
by at least a preponderance of the evidence.

b.   <u>Saracino's Defenses to the Greaves Murder</u>

Saracino argued at trial that the cooperating
witnesses' testimony was the product of cross-contamination of
witness information by government agents and was inconsistent and
unreliable.  Saracino's claim of cross-contamination is without
merit on all counts, but particularly preposterous regarding the
Greaves murder.  As described above, in <u>early 2008</u> – long before
Competiello, Calabro and Sebastian Saracino began cooperating –
David Gordon told the government that Saracino had confessed to
him at a bar that he and the others had murdered Greaves in
Saracino's basement.  After charging Saracino, Calabro and
Competiello with the Greaves murder, the government did not
disclose publicly or to the defendants how, where or by whom
Greaves had been murdered.  When asked about Greaves when
Competiello first met with the government in September 2008, he
answered without any hesitation that Saracino had shot him in the
Saracino family's basement, corroborating Gordon's account of
Saracino's admission.  Thereafter, Calabro and Saracino's

brother, Sebastian Saracino, also stated – in their first meetings with the government – that it was Saracino who fatally shot Greaves in the basement of the Saracino family's house. They did so without hesitation, like Competiello.

To the extent that Saracino continues to argue the materiality of the discrepancies in Calabro, Competiello and Sebastian Saracino's testimony (such as which murder participant drove in which car to Long Island to bury Greaves's corpse), the government submits that these discrepancies cannot outweigh the fact that each and every participant in the murder who testified has consistently identified Saracino as the man who shot Richard Greaves in the back of the head in his own basement.  Rather, these minor inconsistences are attributable to the witnesses' faulty memories of minor details of an event that occurred almost two decades ago.  The inconsistences are particularly understandable given that Saracino, Gioeli and the cooperating witnesses disposed of multiple bodies – Carmine Gargano, Greaves and Cutolo – in close proximity to each other in Farmingdale, New York.  It is thus not particularly surprising that the witnesses would confuse minor details such as who was in a particular car for the disposal of a particular murder victim.

Finally, Saracino presented the fantastical theory that the government's inability to recover Greaves's body suggested that Greaves was never murdered.  A preponderance of evidence, however, shows that Greaves was murdered – each family member who

21

has been interviewed by the government has advised that they have not seen Greaves since August 3, 1995, and as his girlfriend Sandra Tullo testified, a memorial mass was held for him. (T. 4272).  In addition, as noted above, it is unfathomable that Sebastian Saracino, facing a mere false statement charge, would fabricate the murder and then implicate himself in it just to frame his own brother.  This theory also fails to explain why Competiello admitted to the murder so readily.  And it certainly does not explain Saracino's boast that he "did Richie in the dungeon" (T. 3433), or his recorded attempt to identify the "big time informant" (GX 501T(f)) who could have revealed that Saracino killed Greaves.

Simply put, Saracino's defenses should be rejected and his participation in the Greaves murder should be found proven by at least a preponderance of the evidence.

4.   The Government Proved the Defendant's
Involvement in the Dols Murder by
at Least a Preponderance of the Evidence

Between January 1996 and August 1997, Saracino conspired with Cacace, who at the time was a high-ranking and powerful member of the Colombo crime family, Gioeli, Calabro, Saracino and Competiello to murder New York City Police Department ("NYPD") Officer Ralph Dols.  Like the Greaves murder, the evidence establishes Saracino's participation – again, as a shooter – in the Dols murder by at least a preponderance of the evidence.  At trial, the government proved Saracino's involvement

22

in the Dols murder through the testimony of Calabro and Competiello, who participated in the murder; the testimony of Sebastian Saracino, who assisted in disposing of evidence following the murder; surveillance evidence showing Gioeli's close association with Cacace during the period of the murder conspiracy; as well as civilian testimony and documentary evidence corroborating the cooperating witnesses' testimony. Some of this evidence is set forth below.

### a.   Evidence of the Ralph Dols Murder

Calabro testified that he learned from Gioeli that Joel "Joe Waverly" Cacace wanted to have a "piece of work" done (i.e., that Cacace wanted someone killed) on an occasion when Gioeli and Calabro were both at Cacace's social club, located at 2116 Avenue X in Brooklyn.  Gioeli then showed Calabro Dols's car and residence at 2107 East 19th Street in Brooklyn (on the corner of East 19th Street and Avenue U).  (T. 1151, 1154-55).  Calabro and Competiello each testified that Calabro then told Competiello and Saracino about the order to kill Dols (whose identity was unknown to them at the time), and the three routinely conducted surveillance of Dols in the vicinity of Dols's residence.  (T. 1155-56 (Calabro's testimony), 1160 (Calabro's testimony), 2165-66 (Competiello's testimony)).  Sebastian Saracino also testified that Calabro, Saracino and Competiello were "sitting on" someone in the weeks prior to the murder of Dols.  (T. 4321).

Calabro testified that at some point in the summer of 1997, Gioeli revealed to Calabro that Cacace was pressuring Gioeli to commit the murder quickly. (T. 1161). Calabro's testimony on this point was corroborated by Sebastian Saracino's testimony describing how Saracino told him, "this guy [making a gesture indicating Cacace] is coming down on Tommy [Gioeli], and Tommy is coming down on Zeke [a reference to Calabro]." (T. 4321).

Subsequently, as Calabro and Competiello testified, Competiello and Saracino stole a silver Chevrolet Caprice on or about August 18, 1997, to use in the murder. (T. 1161 (Calabro's testimony), 2163-64 (Competiello's testimony)). Their testimony was corroborated by Abraham Shrem, who testified that on or about August 18, 1997, his silver Chevrolet Caprice was stolen from 1807 East 3rd Street in Brooklyn, in very close proximity to where Competiello testified he and Saracino had stolen the vehicle. (T. 2163-64 (Competiello's testimony that he and Saracino stole a car from East 2nd Street between Quentin Street and Kings Highway in Brooklyn), 3575-78 (Shrem's testimony that his car was stolen from 1807 East 3rd Street in Brooklyn)).[6]

Competiello testified that he and Saracino retrieved two guns from a bin in the garage of 475 Avenue Y, Brooklyn, New York, a property owned by Sebastian Saracino and one of the

---

[6]  1807 East 3rd Street in Brooklyn is located between Quentin Street and Kings Highway - one block west of 2nd Street.

24

locations that the Colombo crime family stored guns. (T. 2166, 2970-72). In March 2005, NYPD officers recovered a cache of firearms and ammunition from that very location. (T. 3491-92). Notably, David Gordon also testified that after this weapons seizure, Saracino told him that he (Gordon) might have to "take the fall" for the weapons. (T. 2970).

Competiello and Calabro both testified that together with Saracino, they acted as a three-man hit team that shot Officer Ralph Dols to death outside his home on East 19th Street. Specifically, Calabro and Competiello testified that on the night of the murder, Competiello parked in a Cadillac El Dorado owned by Saracino on East 19th Street and Avenue V, approximately one block south of Dols's residence. (T. 1164 (Calabro's testimony), 2169 (Competiello's testimony)). They each further testified that when Competiello observed Dols turning onto East 19th Street, he radioed Calabro and Saracino to notify them of Dols's approach and Saracino and Calabro, who were in the stolen Caprice a few blocks away, proceeded to Dols's residence. (T. 1166 (Calabro's testimony), 2170 (Competiello's testimony)). Calabro testified that Saracino was armed with a .45 caliber pistol and Calabro was armed with a .44 caliber revolver. (T. 1163). Competiello likewise testified that they were armed with a revolver and a pistol, albeit a .357 revolver and a .45 caliber pistol. (T. 2166). This testimony was corroborated by retired NYPD crime scene unit ("CSU") detective Margaret Roche, who

recovered .45 caliber discharged shells and deformed lead bullets at the scene (T. 3375) and NYPD ballistics expert Wilfredo Torres, who testified that revolvers do not discharge shells (T. 3510).

Calabro and Competiello also both testified that when Dols then parked his car in front of 2107 East 19th Street and as he was exiting his vehicle, Saracino and Calabro got out of the Caprice and shot him.  (T. 1166-67 (Calabro's testimony), 2171 (Competiello's testimony)).  Retired CSU detective Thomas Signorelli corroborated this testimony by describing in detail how the grouping of the bullet holes in the driver's side window of Dols's car and the angle at which they were shot indicated that two shooters were involved.  (T. 3455-58).

Competiello and Calabro's testimony differed with respect to the cars used in the murder.  Competiello recalled that two cars were used in the murder: the stolen Caprice and Saracino's green Cadillac El Dorado.  (T. 2168).  Calabro recalled that three cars were used: the stolen Caprice, Saracino's green Cadillac El Dorado and a brown Mercury Cougar that had been registered to a fabricated person who was

purportedly living at Calabro's wife's grandmother's house.[7]
(T. 1161-62).

After the murder, as Calabro, Competiello and Sebastian
Saracino testified, Saracino, Calabro and Competiello returned to
Saracino's residence in Brooklyn.  (T. 1170 (Calabro's
testimony), 2171 (Competiello's testimony), 4322 (Sebastian
Saracino's testimony)).  Sebastian Saracino testified that
Calabro and Saracino then gave Sebastian Saracino a duffel bag to
discard, which he did.  (T. 4378).  The next day, they learned in
the news that the victim was an NYPD officer.  Calabro testified
that he went to see Gioeli at Gioeli's home in Farmingdale, Long
Island, to discuss the ramifications of having murdered a police
officer.  (T. 1175).

---

[7]  Although Competiello does not recall that a third vehicle
– the brown Mercury Cougar – was used in the murder, Calabro's
testimony regarding this car was corroborated extensively.  He
testified that after the murder, he learned that officers had
told his wife's grandmother, who resided at 1582 West 7th Street
in Brooklyn, that a parking ticket had been issued for the car
for failing to follow alternate side parking restrictions,
causing Calabro to arrange to get rid of the car.  (T. 1180-81,
1183-84).  New York City Department of Finance records reveal
that on the day of the murder, a parking ticket for failing to
follow alternate side parking restrictions was issued to a
vehicle with license plate R282AY, registered to Abraham
Rodriguez at 1582 West 7th Street, Brooklyn, New York.  (T. 3562-
67; GX 383, 386).  Gioeli's cousin Salvatore Tese testified, as
Calabro similarly testified, that in January 1998, Gioeli had
Tese store a brown American-made car consistent with a brown
Mercury Cougar.  (T. 1183-84 (Calabro's testimony); 3362-63
(Tese's testimony)).  Finally, FBI Special Agent Scott Curtis
testified that in the late 1997 or early 1998, he saw a brown car
at Tese's residence and that in January 1998, he observed a brown
Mercury registered to Abraham Rodriguez with license plate
R282AY.  (T. 3589-90).

The use of Saracino's green Cadillac El Dorado in the Dols murder was extensively corroborated.  Sebastian Saracino testified about his brother Dino's top priority after killing a police officer – keeping his Cadillac:[8]

> My brother was pissed off because he paid good money for the car, it was his first nice car, he didn't want to . . . get rid of it, nobody was helping him and nobody was giving him money to get rid of the car, so he found a place in the city, freight shipping companies.  So they drove it out to the city and we sent it down to Nino [cousin Antonino Saracino] in Florida.

(T. 4324).  And Sebastian Saracino's testimony on this point was fully corroborated by the testimony of Saracino's cousin Antonino Saracino (T. 4323-24) and Calabro (T. 1180), as well as Department of Motor Vehicle records presented at trial, which showed the transfer of the vehicle from a close associate of Dino Saracino (Joseph Casa) to Antonino Saracino in 1998.  (GX 304b).

In addition, statements from eyewitnesses taken the day following the Dols murder – which were not adduced at trial – corroborate the cooperating witnesses' testimony.  For example, one eyewitness advised police officers that, from her residence on East 19th Street between Avenue U and Avenue T, she observed a

---

[8]  This detail, while relatively minor in the breathtaking scope of Saracino's crimes, in some ways says everything one needs to know about Saracino: his extraordinary selfishness and callous disregard for human life is so great that  his primary concern after having learned he killed an innocent man, and an NYPD officer at that, was finding a safe home for his "first nice car."

hunter green El Dorado with a full tan-colored rag top traveling at a high rate of speed northbound on East 19th Street. She further advised that she saw a second vehicle also traveling at a high rate of speed in front of the El Dorado. (A copy of a report documenting the witness's statements is enclosed as Exhibit D.)

In light of the above, and all the evidence adduced at trial, Saracino's participation in the Dols murder was proven by at least a preponderance of the evidence.

### b. <u>Saracino's Defenses To The Dols Murder</u>

As he argued with respect to the Greaves murder, Saracino argued at trial that the cooperating witness testimony offered by the government lacked credibility and was in part internally inconsistent. As the government argued at trial, Saracino's claims miss the most important point: the testimony of Calabro, Competiello and Sebastian Saracino regarding Saracino's role as a shooter and their own roles in the Dols murder was entirely consistent. The minor inconsistencies – such as the number of cars used in the murder – are more attributable to faulty memories of an event that occurred almost fifteen years earlier. Moreover, the existence of such inconsistences between the witnesses is proof that the accounts were not the result of cross-contamination by the government as he claimed at trial.

At trial Saracino also argued that Officer Dols's dying declaration that there were three – not two – men who shot him

29

suggests that Calabro and Competiello's testimony was lacking. However, Officer Dols's dying declaration does not, in fact, undermine their testimony.  Notably, the police report containing the declaration stated that Dols was wearing an oxygen mask and could only give one-word answers to the detective's questions. In that context, his declaration is consistent with the testimony presented at trial; that is, there were three men, Calabro, Saracino and Competiello.  Dols was is no state to clarify that one of the three men was a driver of a getaway car as opposed to a shooter.  Morever, Dols had just been ambushed by a fusillade of lead bullets and died shortly thereafter; he was undoubtedly in no state to explain anything in any detail.

Because Saracino's defenses are otherwise inconsistent with the evidence, they should be rejected and his participation in the Dols murder should be found proven by at least a preponderance of the evidence.

     5.   The Government Proved Saracino's Involvement in The Cutolo Murder by at Least a <u>Preponderance of the Evidence</u>

In 1999, Saracino entered into a conspiracy with then-Colombo crime family acting boss Alphonse "Allie Boy" Persico, Gioeli, Calabro, Competiello and others to murder William "Wild Bill" Cutolo, the underboss of the Colombo crime family.  On May 26, 1999, Gioeli, Saracino and the others murdered Cutolo as planned and disposed of his body in Farmingdale, New York.

Like the Greaves and Dols murders, the evidence establishes Saracino's involvement in the Cutolo murder by at least a preponderance of the evidence, including, among other evidence, the testimony of Calabro and Competiello, who participated directly in the Cutolo murder; the testimony of Sebastian Saracino regarding admissions made by Saracino; recordings containing admissions of coconspirator Vincent Manzo; telephone records; autopsy evidence; and testimony regarding the recovery of Cutolo's body on October 6, 2008 in the very location where Competiello told the FBI he and the others buried Cutolo.

a.   Evidence of Cutolo's Murder

Calabro and Salvatore Vitale, who at the time of Cutolo's murder was the underboss of the Bonanno organized crime family, testified that when Cutolo was killed, Cutolo was the underboss of the Colombo crime family.  (T. 316 (Vitale's testimony); 1205 (Calabro's testimony)).  As Calabro testified, the acting boss at the time, Alphonse Persico, and administration member John DeRoss believed that Cutolo had become too powerful and were concerned that he would take over the crime family. (T. 1206-07).  Calabro explained that prior to the murder, at Gioeli's request, he met with Gioeli in the garden behind Our Lady of Lourdes church in Massapequa, New York.  (T. 1196-97). There, as Calabro testified, Gioeli told him that "he had just left Pooch [a reference to Persico] and Betty Boop [a reference to DeRoss] and he was to go here [while Gioeli gestured a sign

31

for murder] with this guy [while Gioeli gestured a reference to Cutolo].” (Id.) Calabro understood that Gioeli was telling him that Persico and DeRoss wanted to murder Cutolo and was enlisting Calabro's assistance. Calabro readily agreed.

Calabro testified that initially, they planned to have Vincent “Chickie” DeMartino assist in the murder. Thereafter, however, Gioeli and Calabro met with Persico at a Nissan dealership in Hempstead, New York, where they requested and received permission from Persico to have Gioeli's crew, namely, Calabro, Saracino and Competiello, carry out the murder without DeMartino. (T. 1215-16).

Joseph Gorga, Cutolo's mechanic, testified that on May 26, 1999, at Cutolo's request, Gorga drove Cutolo to 92nd Street and Shore Road in Brooklyn, New York. (T. 1926). Calabro and Competiello testified about what happened once Gorga dropped Cutolo off in Brooklyn. Calabro explained that Gioeli drove Cutolo to the vicinity of Saracino's basement apartment. (T. 1195). Calabro and Competiello testified that when Cutolo arrived, Calabro walked him into the apartment and then shot Cutolo with .38 caliber revolver. (T. 1221 (Calabro's testimony), 1233 (Calabro's testimony), 2185 (Competiello's testimony)). They also testified that Competiello and Saracino, who were armed with firearms, were hiding in the apartment to assist if needed. (T. 1219-20, 2182).

Their testimony was further corroborated by Saracino's own admissions to Sebastian Saracino, which he made while discussing renovations their home, where both Cutolo and Greaves were killed.  Specifically, Sebastian Saracino testified:

> Q:  Explain exactly what your brother said to you about Wild Bill's murder.
>
> A:  That Tommy dropped him off and Zeke [Calabro] walked him in and blasted him, and that Joe Caves was in the bathroom, and he was behind the door of the basement.
>
> Q:  Who was behind the door?
>
> A:  My brother Dino.  So he was having his apartment renovated upstairs and he was worried about the door.  So I said, if you are worried, then just have the door changed.  Have the kid [who was performing renovations] change it.

(T. 4367).  Sebastian Saracino then identified in a photograph the metal door that Saracino used to replace the wooden louvered door that was present when Cutolo was killed.  (T. 4368).

Competiello and Calabro also testified about the events following Cutolo's murder.  According to the two witnesses, Competiello and Saracino cleaned up Cutolo's body and the area surrounding where he was shot.  (T. 1222 (Calabro's testimony), 2186 (Competiello's testimony)).  Among other items, Competiello and Saracino removed $10,000 in cash from Cutolo's person, which

they split.[9]  (T. 1223-24 (Calabro's testimony), 2186
(Competiello's testimony)).  The remaining personal items
recovered from Cutolo's body were placed inside a bucket, which
was then filled with cement and discarded from a Brooklyn pier.
(T. 1223-24 (Calabro's testimony), 2192 (Competiello's
testimony)).  Gioeli and Saracino, together with Calabro,
Competiello and Colombo crime family member Vincent Manzo, among
others, transported Cutolo's body to Farmingdale, New York, where
Calabro, Competiello and Saracino buried Cutolo.  (T. 1225-30
(Calabro's testimony)).

        Calabro and Competiello's testimony was directly
corroborated by, inter alia, admissions by Vincent Manzo to
cooperating witness Reynold Maragni in November and December
2011.  On November 18, 2011, Manzo told Maragni that four people
could implicate Manzo in the Cutolo murder: Calabro, Saracino,
Competiello and Gioeli.  (See generally GX 502T(a)).
Specifically, Manzo said: "The only ones that really knew I had
anything to do with that are me, Joey Caves and the other guy
Dino.  The two Dinos [Calabro and Saracino], Joey Caves
[Competiello], and Tommy [Gioeli]."  (GX 502T(a) at 1).  On

---

        [9]  Competiello's testimony regarding the cash was also
corroborated by a record showing that on June 11, 1999 – just two
weeks after Cutolo's murder – Competiello purchased a 1997 silver
Grand Marquis.  (GX 365).  Although Competiello does not remember
what he used his share of the $10,000 to buy, he testified that
he used the proceeds of crimes he committed to buy, among other
things, cars.  (T. 2193).

December 8, 2011, Manzo explained again what transpired on the

night that he participated in the disposal of Cutolo's body:

MARAGNI:    Most likely it was Dino's house,
            but you went to a house in the
            driveway.  Then what's you do?  You
            popped?

MANZO:      Popped the trunk

MARAGNI:    [UI]

MANZO:      Threw him in.  Followed them out.
            And that's the way it was.

MARAGNI:    Okay.

MANZO:      And I was alone.

MARAGNI:    You were alone when you drove from
            Long Island.  Went to the bowling
            alley.  Where?  Out in Amityville?

MANZO:      Yeah, where he lives.

MARAGNI:    Oh, okay.  Alright.

MANZO:      Wasn't too far from where he lives.

MARAGNI:    Exactly.  What the fuck were they
            thinking?  Then Tommy got with you?

MANZO:      Right.  He showed me where the hole
            was.  'Cause I didn't know where to
            go there.

MARAGNI:    So he showed you where to go.
            Okay.  You got there, they took him
            out.

MANZO:      Right.

MARAGNI:    They took him out.  Tommy got back
            in your car?

MANZO:      Tommy got in my car.

MARAGNI:    Back to the bowling alley.

```
MANZO:      Tommy didn't even get out of the
            car.

MARAGNI:    He stayed in the car the whole
            time.

MANZO:      Right.

MARAGNI:    Okay, you took him back to the
            bowling alley.

MANZO:      Right.

MARAGNI:    He got out.  They got in.

MANZO:      Right.  He says, "Go ahead.  Take a
            while."

MARAGNI:    Okay, Big Dino and Joey Caves.

MANZO:      Right.

MARAGNI:    Little Dino stayed with him.

MANZO:      Right.
```

(GX 502T(c) at 5-7).  Finally, Competiello and Calabro's testimony, along with Manzo's admissions to Maragni, were further corroborated by the recovery of Cutolo's body in a wooded area in Farmingdale on October 6, 2008, in the very location where Competiello told the FBI he and the others buried Cutolo.  (T. 65 (testimony of Special Agent Katherine Kelley with the Evidence Recovery Team); 3651 (testimony of Special Agent Curtis)).

Calabro and Competiello's testimony was corroborated by ballistics evidence and a medical examiner's testimony.  For example, the medical examiner testified that, as Calabro and Competiello testified, the cause of Cutolo's death was determined to be homicide and the bullet recovered from Cutolo's head was a

36

.38 caliber bullet.  (T. 150; GX 224; T. 1233 (Calabro's testimony that he used a .38 caliber revolver to murder Cutolo), 2185 (Competiello's testimony that Calabro used a .38 caliber gun to murder Cutolo)).

Finally, Calabro and Competiello's testimony was corroborated by telephone records.  First, the records reveal that Persico and a telephone number listed for "Tommy G" (presumably Tommy Gioeli) in Cutolo's organizer, 917-947-7566, were in frequent communication in the days leading up to Cutolo's murder.  For example, right before the murder on May 20, 24 and 25, 1999, Persico contacted Gioeli multiple times.  At 6:30 p.m. on May 26, 1999, there was another call between Persico and Gioeli, presumably to confirm that Cutolo had been killed according to the plan.  Second, telephone records for a cellular telephone used by Cutolo revealed that the last three outgoing telephone calls placed from Cutolo's telephone were:

| Date | Time | Dialed Number | Duration |
|------|------|---------------|----------|
| 5/26 | 1:16 p.m. | 718-763-5500 | 4 minutes |
| 5/27 | 3:21 p.m. | 718-763-5500 | 1 minute |
| 5/27 | 3:26 p.m. | 917-947-7566 | 1 minute |

As the government argued at trial, the first call on May 27, 1999, the day after Cutolo was last seen, was inadvertent, i.e., Calabro, Competiello and/or Saracino accidentally pressed redial on Cutolo's cellular telephone, which they had taken from his person, and called the number last called by Cutolo (prior to his murder).  The second call on May 27, 1999, was a call from the

37

coconspirators to Gioeli as they were getting rid of Cutolo's belongings, dumping them in the ocean.

In light of the above and all the evidence adduced at trial, Saracino's participation in the Cutolo murder was proven by at least a preponderance of the evidence.

        b.   <u>Saracino's Defenses to the Cutolo Murder</u>

Faced with such overwhelming evidence, Saracino argued at trial that the government's witnesses – Calabro, Competiello and Sebastian Saracino – as well as Manzo, who did not know he was being recorded, were all lying when they implicated Saracino in the Cutolo murder.  As he did with the Greaves murder, Saracino argued extensively about witnesses' faulty memories regarding who drove in what car to bury Cutolo.  But as explained above, any inconsistences are easily attributable to the amount of time that has passed since the murder and the number of similar murders in which Saracino and the others participated.

Due to these significant weaknesses, Saracino's defenses should be rejected and his participation in the Cutolo murder should be found proven by at least a preponderance of the evidence.

       B.   <u>The Advisory Guidelines Range</u>

For the reasons set forth below, the government submits that the adjusted offense level under the Guidelines is at least

a level 51, which is predicated on the following Guidelines calculation:[10]

<u>Murder of Joseph Scopo (R.A. 3)</u>

Base Offense Level (§ 2A1.1)                    43

<u>Murder of Richard Greaves (R.A. 9)</u>

Base Offense Level (§ 2A1.1)                    43

<u>Murder of Ralph Dols (R.A. 11)</u>

Base Offense Level (§ 2A1.1)                    43

<u>Conspiracy to Murder Michael Burnside (R.A. 12)</u>

Base Offense Level
(§§ 2X1.1(a), 2X1.1(b)(2), 2A1.1)              40

<u>Murder of William Cutolo (R.A. 13)</u>

Base Offense Level (§ 2A1.1)                    43

<u>Multiple Racketeering Act Analysis (§ 3D1.4)</u>

Highest Adjusted Offense Level                 43

Units:

        Racketeering Act Three (§ 3D1.4(a))    1

        Racketeering Act Nine (§ 3D1.4(a))     1

        Racketeering Act Eleven (§ 3D1.4(a))   1

---

[10]   As noted above, Saracino's participation in the extortionate collection of credit from Peter Risk, the robbery of Chemical Bank, the conspiracy to distribute cocaine, the extortion of Johnny Cash, the witness tampering relating to David Gordon and the litany of robberies, burglaries and thefts does not affect the calculation of the applicable Guidelines range, and accordingly, the government will not include these acts in the Guidelines calculation set forth herein.

|  |  |  |
|---|---|---|
| Racketeering Act Twelve (§ 3D1.4(a)) | 1 | |
| Racketeering Act Thirteen (§ 3D1.4(a)) | 1 | |
| Total Units: | 5 | |
| Levels Added (§ 3D1.4): | | +4 |

Adjusted Offense Level

|  |  |
|---|---|
| Adjusted Offense Level | 47 |
| Plus: Aggravating Role (§ 3B1.1(b)) | +3 |
| Total: | 50 |

Because the defendant falls within Criminal History Category II (PSR ¶ 503), this level carries a range of imprisonment of life. However, because the statutory maximum penalty for the defendant's offense is 100 years, the effective Guidelines range is 100 years.

Even assuming arguendo that the Court were to find that the four murders set forth above do not constitute relevant conduct, the government submits that Saracino's applicable Guidelines sentencing range remains unchanged.[11]

Conspiracy to Murder Orena Faction Members (R.A. 3)

|  |  |
|---|---|
| Base Offense Level (§§ 2X1.1(a), 2X1.1(b)(2), 2A1.1) | 40 |

---

[11] As noted above, Saracino's participation in the extortionate collection of credit from Peter Risk and the witness tampering relating David Gordon, both of which the jury found proven as to Saracino, does not affect the calculation of the applicable Guidelines range, and accordingly, the government will not include these acts in the Guidelines calculation set forth herein.

40

<u>Conspiracy to Murder Michael Burnside (R.A. 12)</u>

| | |
|---|---|
| Base Offense Level<br>(§§ 2X1.1(a), 2X1.1(b)(2), 2A1.1) | 40 |

<u>Multiple Racketeering Act Analysis (§ 3D1.4)</u>

Highest Adjusted Offense Level                40

Units:

|  |  |
|---|---|
| Racketeering Act Three (§ 3D1.4(a)) | 1 |
| Racketeering Act Twelve (§ 3D1.4(a)) | <u>1</u> |

Total Units:                          2

Levels Added (§ 3D1.4):                      <u>+2</u>

<u>Adjusted Offense Level</u>

Adjusted Offense Level                42

Plus: Aggravating Role (§ 3B1.1(b))          <u>+3</u>

Total:                                45

Because the defendant falls within Criminal History Category II, this level still carries a range of imprisonment of life. However, because the statutory maximum penalty for the defendant's offense is 100 years, the effective Guidelines range is 100 years.

C.   The Court Should Impose Forfeiture
     in the Amount of $1.4 Million

Under 18 U.S.C. § 1963(a)(3), a defendant who is convicted of 18 U.S.C. § 1962 is to forfeit "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or

unlawful debt collection in violation of section 1962." So long as it was "reasonably foreseeable" to a defendant that "the racketeering enterprise in which he participated would engage in [such] activities," forfeiture of such proceeds is appropriate. United States v. Gotti, 459 F.3d 296, 347 (2d Cir. 2006) (citing United States v. Fruchter, 411 F.3d 377, 384 (2d Cir. 2005) (stating, in challenge to RICO forfeiture amount, that "[s]o long as the sentencing court finds by a preponderance of the evidence that the criminal conduct through which the proceeds were made was foreseeable to the defendant, the proceeds should form part of the forfeiture judgment"). To include the proceeds from a racketeering act in the total forfeiture judgment, there must be a preponderance of evidence that "the criminal conduct through which the proceeds were made was foreseeable to the defendant." Fruchter, 411 F.3d at 384 ("Although we have not previously considered whether proceeds derived from conduct forming the basis of a charge of which the defendant was acquitted can be counted as 'proceeds' of racketeering activity, it seems plain that they can." (citing United States v. Genova, 333 F.3d 750, 762 (7th Cir. 2003) ("The fact that Genova was acquitted of counts charging that he devoted the City's resources to his home-improvement projects does not eliminate all possibility of a forfeiture based on these activities."); United States v. Edwards, 303 F.3d 606, 643 (5th Cir. 2002)).

42

Because the government has adduced evidence at trial, supplemented by the information set forth in the government's response to the defendant's objections to the PSR, establishing that the defendant and his coconspirators earned at least $1.4 million in connection with their participation in the racketeering conspiracy, all of which was foreseeable to the defendant, the government submits that the Court should also impose a forfeiture judgment in the amount of $1.4 million.

D.   The Relevant Section 3553(a) Factors Support
     the Imposition of the Maximum Possible Sentence

The government respectfully submits that a sentence of 100 years' imprisonment, which is a sentence within the Guidelines range, is not greater than necessary to serve the purposes set forth in Section 3553(a) and will hold the defendant accountable for his lifetime of crime, including his longstanding participation in the Colombo crime family and his participation in crimes such as the murders of Greaves, Dols and Cutolo.

1.   Legal Standard

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentence, but also may tailor the sentence in light of other statutory concerns. See 18 U.S.C. § 3553(a). In Gall v. United States, 552 U.S. 38 (2007), the Court elucidated the proper procedure and order of consideration for sentencing courts to

43

follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall</u>, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  <u>Id.</u> at 596-97 (citation and footnote omitted).

    2.  <u>Section 3553(a) Analysis</u>

      a.  <u>Nature and Circumstances of the Offenses</u>

As detailed above and in the PSR and as set forth more fully during Saracino's trial, Saracino committed heinous crimes as part of his abiding criminal commitment to the Colombo crime family over the course of nearly two decades: murder, murder conspiracy, robbery, extortion, loansharking, assault and many other crimes.  The disturbing nature of his conduct cannot be overstated.  Saracino shot Greaves and Dols to death, and participated in the murder of Cutolo.   He also helped to dispose of the bodies of Gargano, Greaves and Cutolo in a remote wooded area in Long Island, depriving them of the dignity of a burial, and their families of the closure a burial can provide.  Saracino plotted murder to please superiors in the crime family, to

establish and advance his position within the Colombo crime family and to seek personal vengeance.  He stole money and then used that money to establish a lucrative loansharking business enforced by violence.  When law enforcement closed in on his criminal activities, he obstructed justice.

Given the breathtaking nature of Saracino's crimes and the defendant's supervisory role in the racketeering enterprise, the nature and characteristics of the offenses weigh heavily in favor of imposing a sentence that incarcerates him for life.

b.   <u>History and Characteristics of the Defendant</u>

Saracino's history and characteristics also strongly weigh in favor of the imposition of the maximum sentence permitted by law.

i.   Saracino's Dedication to the Goals of
         <u>the Colombo Crime Family</u>

Saracino's unwavering loyalty to the Colombo crime family and its goals was perhaps best demonstrated through his eager participation in the Greaves, Dols and Cutolo murders. When Gioeli's crew decided that Greaves had to be killed, Saracino fatally shot Greaves in the head as he sat at the kitchen table in Saracino's basement.  Saracino and the others then took the body of their friend and criminal associate and buried it in a secluded area near Gioeli's home.  When he learned of the order to kill Dols, a man he did not know, Saracino assisted in stealing a car, procuring guns from his family's

45

property at 475 Avenue Y in Brooklyn and conducted surveillance of his target.  Saracino then fatally shot Officer Dols in a hail of bullets in front of his home as Dols tried to exit his car. Not long afterwards, when Saracino received the next order to kill, he armed himself with a gun and waited in the basement of his parents' home, ready to shoot if called upon, for Cutolo to arrive.  At the conclusion of this murder spree, when they had earned induction into the Colombo crime family, Saracino bragged to Competiello that he had one more "notch" than Competiello and ran his hand through his hair, a reference to Joel Cacace, who had ordered the murder of Officer Dols.

Saracino also profited from his participation in the crime family.  In 1995, Saracino earned tens of thousands of dollars with his share of the approximately $200,000 in proceeds from the robbery of Chemical Bank on Hempstead Turnpike in East Meadow, New York.  He also participated in a score of burglaries of banks and other commercial establishments and thefts from trucks.  (PSR ¶¶ 92-95).

Through these crimes and more, Saracino earned a reputation as a lethal mob soldier.  He is a murderer, extortionist, drug dealer, loanshark, thief and obstructionist. He spent his twenties putting "notches" on his belt by taking life by his own hand.  Such craven behavior brought him respect and power in the Colombo crime family; by the 2000s, Saracino was

46

a soldier with close bonds to the family's street boss Gioeli and Gioeli's confident, captain Dino Calabro.

Significantly, Saracino traded on his reputation and the reputation of Gioeli's crew for murder and other acts of violence to launch and maintain a lucrative loansharking business. Sebastian Saracino testified that at the time of Saracino's arrest in June 2008, Saracino had more than $500,000 in outstanding loanshark loans owed to him. (T. 4352). Calabro similarly testified that Saracino had lent out "hundreds of thousands of dollars." (T. 1056). Gordon testified Saracino had extended numerous loanshark loans between the mid-1990s and 2007 and as of 2008, Gordon alone owed Saracino $120,000 in outstanding loanshark loans. (T. 2974-75).

Saracino's commitment to crime and the Colombo crime family continued even after his June 2008 arrest. First, he made efforts to maintain his loansharking operation while he was incarcerated. For example, prior to his arrest, he made sure Gordon and his brother Sebastian Saracino had access to the list of individuals who owed money to him. (T. 3013, 4351). Saracino wanted to ensure that they would continue to collect payments from the loanshark customers he extorted. On the day of Saracino's arrest, the FBI recovered a leather folder from a car belonging to Saracino's wife containing a calculator and a ledger pad with names and numbers, which corresponded to loanshark amounts owed to Saracino. (T. 2599-2601; see T. 3012-14 (Gordon

testifying that Saracino's "book" or "leather binder" had the "information of all his [loanshark] customers; what they paid, how much they owed"); GX 342 (ledger recovered on June 23, 2008), 501(I) (excerpt of a consensual recording between April Saracino and Gordon on June 23, 2008 in which April states "I think I have the book in my truck.")).

In addition, Saracino's post-arrest efforts were revealed on several consensual recordings made by Thomas McLaughlin after Saracino's arrest. Anthony Russo, then a Colombo crime family acting captain, associate Larry Sessa and McLaughlin discussed Saracino's attempts from jail to collect Saracino's outstanding loansharking proceeds. For example, on a consensual recording made on September 21, 2010, Anthony Russo told McLaughlin that Russo had received a message from Saracino regarding the outstanding loans owed to Saracino and that Sessa had given one of the debtors a "massive beating." An excerpt of a draft transcript of the recording follows:

> RUSSO:          First of all, I gotta message
>                 straight from the horse's
>                 mouth. . . . Dino's [Dino
>                 Saracino] wife [April
>                 Saracino] wanted to know who
>                 is AR [Anthony Russo's
>                 initials].
>
> MCLAUGHLIN:     Who is that?
>
> RUSSO:          [Sarcastically]  I don't know.
>                 Who's AR?
>
> MCLAUGHLIN:     AR?  Oh you.

RUSSO:             Okay.  And he said, "I got a
                   message from my husband [Dino
                   Saracino] for you to go see AR
                   and tell him I don't want no
                   one going to see my wife
                   [April Saracino] with any kind
                   of monies."

                        *  *  *

RUSSO:             That's another thing.  That's
                   another thing.  I gotta list
                   [of individuals who owed money
                   to Dino Saracino].

                        *  *  *

MCLAUGHLIN:        Yeah, Fatso [a nickname for
                   Sessa] must have been keeping
                   it quiet so he can run around
                   and fuck

RUSSO:             No, he's been telling me
                   everything since day one.  He
                   came to me when he first got
                   the list.  Said, What do we do
                   with this list?  I said, Stop
                   being so concerned about this
                   poor kid right now because
                   what are you gonna do, get in
                   trouble for this kid.

MCLAUGHLIN:        Listen to me, he ain't running
                   around for nothing.

RUSSO:             No, of course not.   Whatever
                   he's doing, he's doing.

MCLAUGHLIN:        There's this one kid I told
                   him that we need to find, that
                   he needs to find that owes a
                   lot of money.

RUSSO:             First of all, why's this kid
                   Buzz [UI] for it.

MCLAUGHLIN:        He was gonna bring the money.

RUSSO:             How much is it?

                              49

| | |
|---|---|
| MCLAUGHLIN: | It's $200 a month. |
| RUSSO: | How much does he owe? |
| MCLAUGHLIN: | I don't even know. |
| RUSSO: | 15,000? |
| MCLAUGHLIN: | No, I think it was like 12,000. |
| RUSSO: | And he wants to give him 200 a month?  It just went up to 500. |

(A copy of excerpts of the recording is enclosed on Exhibit B in a file named "message from Dino.wav").  This conversation about Saracino's post-incarceration efforts to collect loanshark money is further corroborated by Gordon's recordings of Saracino's wife, who had been enlisted by Saracino to assist in Saracino's loansharking business (see T. 2976; GX 501(I)), as well as records of the Metropolitan Detention Center ("MDC") that reveal that Sessa, using an alias, was depositing money into Saracino's account.

Saracino also continued to show his loyalty to the Colombo crime family.  For example, he assaulted a fellow inmate simply because the inmate had disrespected Gioeli, a superior in the Colombo crime family.  On September 30, 2010, April Saracino told McLaughlin and Anthony Russo that she had spent three hours that day with Saracino, who was then incarcerated in the Special Housing Unit ("SHU").  She explained the reason for Saracino's placement in the SHU:

> MCLAUGHLIN:      What's the investigation for?
>
> A SARACINO:      Someone was abusing Tommy
>                  [Gioeli] and he, he went -
>
> RUSSO:           Went to work on them?
>
> A SARACINO:      Yeah.  I think [UI] fight.

MDC records confirm that Saracino was sanctioned for a fight at the MDC on September 26, 2010, four days before April Saracino met with McLaughlin and Russo.  (PSR ¶ 513).

### ii.  <u>Saracino's Other Characteristics</u>

As a young man, Saracino made a deliberate choice to affiliate himself with organized crime.  Unlike many defendants who appear before the Court, Saracino had ample opportunities to live a productive and law-abiding life.  He was raised by two hardworking and loving parents and enjoyed close relationships with his older and younger brothers.  (<u>E.g.</u>, PSR ¶ 507 (describing Saracino's father as "hard-working man who stressed education and respect")).  Saracino's parents raised him and his brothers in a middle-class lifestyle and by all counts, rejected the means and methods of the mafia.  (<u>Id.</u>)  Yet, the defendant at an early age dropped out of school and elected to devote his life to the mob, following his cousin, Dino Calabro, and the man to whom Calabro reported, Gioeli, into its violent lifestyle.

Notwithstanding the example set by his parents, the defendant chose a far easier and more lucrative pursuit: earning money through crime under the auspices of the Colombo crime

51

family.  In fact, Saracino was such a successful criminal that he
was able to live a comfortable life and support several children
(see PSR ¶¶ 509-10), without working an honest day in his life.
(See PSR ¶ 521).  Nor has Saracino paid a dime in taxes on the
hundreds of thousands of dollars he has earned in illegal
proceeds.  (See PSR ¶ 522).  Instead, he preyed upon civil
society as a member of a pernicious gang.  Without any employment
commitments, Saracino has been able to stay out late at night,
socialize with other mafia members at gambling and social clubs
affiliated with the mob, and be catered to by loyal associates
like Gordon who drove him around.  Saracino also had ample time
to spend with his wife and also his girlfriend with whom he
fathered a child.

Moreover, Saracino has remained defiant and unrepentant
to the end.  When the government's investigation drew close to
him and the Gioeli crew, he tampered with grand jury witnesses
and obstructed the investigation.  Saracino bragged to Gordon
that the government could not "break the wall of silence,"
referring to him and the other members of Gioeli's crew.
Saracino told Gordon, in a statement corroborating Gordon's
position as a trusted part of Saracino's inner circle, "we didn't
allow too many people in our lives; we really didn't."  (A copy
of excerpts of a consensual recording dated May 6, 2008 are
enclosed on Exhibit B in a file named "Wall of silence.wav", and
a draft transcript of those excerpts is enclosed as Exhibit E.)

Further, he relished serving prison time almost as a badge of honor.  Saracino suggested to Gordon in a recorded conversation on May 7, 2008 that he might have to serve 17 years in jail.  He said, "I'll take it fucking with a smile."  (A copy of excerpts of a consensual recording dated May 7, 2008 are enclosed on Exhibit B in a file named "17 years.wav", and a draft transcript of those excerpts is enclosed as Exhibit F.)

The time has come for Saracino to be held accountable for his horrific crimes.  Any sentence less than one that results in life incarceration would undermine the gravity of the defendant's choices and send a message to others that they too can succeed through this violent life style.

In light of the above, Saracino's history and personal characteristics support the imposition of the maximum possible sentence under the law, one that effectively incarcerates him for life.  See 18 U.S.C. § 3553(a)(1).

### c.   Need to Protect the Public From Further Crimes of the Defendant

As noted above, Saracino's crimes merit imposition of an effective life term of incarceration, to reflect the seriousness of the offenses, and to provide just punishment.  Such a sentence is also necessary to protect the public from this defendant.  See 18 U.S.C. § 3553(a)(2)©.  Saracino is an unrepentant criminal who has spent his entire adult life preying on those weaker than him.  It is clear, based on his conduct

53

before and after his incarceration, that he is thoroughly committed to the Colombo crime family, a gang that glorifies and thrives on violence.  Total incapacitation is required.

> d.  Need to Avoid Unwarranted Sentencing Disparities

A sentence that amounts to a life term of incarceration is also appropriate to avoid unwarranted sentencing disparities. The two individuals who have been sentenced for their participation in the murder of William Cutolo, in which murder a preponderance of evidence shows Saracino's participation, each received a sentence of life imprisonment.  See United States v. Persico, et al., Crim. Docket No. 04-911 (JS) (Docket Entry Nos. 742 and 743).  Similarly, John Pappa, who was convicted of his participation in the murder of Joseph Scopo, among other murders, was sentenced to life imprisonment.  See United States v. John Pappa, et al., Crim. Docket No. 97-1005 (RJD) (Docket Entry No. 188).  Numerous other individuals who were found culpable of murders committed in connection with the Colombo crime family were also sentenced to life terms of imprisonment.  See, e.g., United States v. Russo, et al., Crim. Docket No. 92-351 (CPS) (Docket Entry Nos. 1524, 1526 and 1528) (sentencing Joseph Russo, Anthony "Chucky" Russo and Joseph Monteleone to life terms of imprisonment for their participation in the murder of John Minerva and Michael Imbergamo during the Colombo crime family war).

The government anticipates that Saracino will seek a sentence less than that received by his co-defendant Thomas Gioeli on the grounds that sentencing Saracino to a term of imprisonment greater than Gioeli's sentence (which is necessarily limited to 20 years pursuant to the statutory maximum) would create an unwarranted sentencing disparity among defendants who have been found guilty of similar conduct.  See 18 U.S.C. § 3553(a)(6).  As a preliminary matter, it is important to note that while the Court may consider the relative sentences of Gioeli and Saracino, the Second Circuit has repeatedly held that Section 3553(a)(6) only requires a district court to consider nationwide sentence disparities; it "does not require a district court to consider disparities between co-defendants." United States v. Frias, 521 F.3d 229, 236 (2d Cir. 2008) (emphasis added).  Thus, notwithstanding the fact that they were on trial together, the Court is by no means bound to consider their sentences as a single unit.

In the event that the Court does decide to consider their relative sentences, however, the government submits that such a comparison should not result in the same or even similar sentences because the defendants are not, in fact, similarly situated.  Section 3553(a)(6) counsels courts to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Id. (emphasis added).  In this case, as the Court is

55

well aware, the jury found Saracino guilty of five separate
counts.  Although both defendants were found guilty of
racketeering conspiracy, Saracino was also convicted of very
different and largely independent criminal activity, including
his efforts to maintain a loansharking business and obstruct
justice.  Thus, in certain important ways, Saracino and Gioeli
are not similarly situated.

Moreover, they are not similarly situated for the very
simple reason that they are facing radically different statutory
maximum sentences.  The Second Circuit faced a similar scenario
in <u>Frias</u>, in which the defendant was sentenced to life and an
equally culpable co-defendant was sentenced to 25 years.  <u>Frias</u>,
521 F.3d at 236.  The court noted that these two defendants were
"not similarly situated" because the co-defendant pleaded guilty
to two counts "that carried a statutory <u>maximum</u> sentence of 25
years, whereas Frias's offense of conviction carries a statutory
range of 20 years to life and a Guidelines sentence of life."
<u>Id.</u> (emphasis in original).  Similarly, it would be manifestly
unjust for Saracino to benefit from the fact that Gioeli – a
defendant from whom Saracino repeatedly demanded severance – was
convicted of one count and faces a statutory maximum sentence of
20 years.  This is especially true in light of their significant
age differences; sentencing Saracino to what amounts to a life
sentence life ultimately may not be materially different from
sentencing Gioeli to 20 years, as the government has urged the

Court to do.  See, e.g., Transcript of Bail Application, dated June 22, 2012, at 13-14 (observing that Gioeli, in light of his age and medical conditions, was "facing a sentence that could well put him in jail for the rest of his life").

Accordingly, sentencing Saracino to a term that amounts to life imprisonment would not create an unwarranted disparity of the kind contemplated by section 3553(a)(6).

e.   Other Section 3553(a) Factors

In light of the defendant's lengthy history of involvement in criminal activity, including his long history in the Colombo crime family, a significant sentence of incarceration in this case is appropriate in order to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Indeed, a modest sentence on racketeering charges for a Colombo crime family member who participated in multiple murders and murder conspiracies could well promote disrespect for the law. See, e.g., United States v. Cutler, 520 F.3d 136, 154 (2d Cir. 2008) (concluding that the district court made errors in certain "Guidelines applications and in its departure decisions; that the sentences imposed did not properly interpret certain of the sentencing factors that the court was required to consider under 18 U.S.C. § 3553(a), such as just 'punishment' and deterrence of others; and that some of the court's rationales would promote disrespect for the law").

57

In sum, a significant incarceratory sentence is justified by the defendant's unrepentant participation in the Colombo crime family and his participation in breathtaking acts of violence.  To fulfill the goals of punishment, deterrence and respect for the law, 18 U.S.C. § 3553(a), the government respectfully submits that a sentence of 100 years' imprisonment is sufficient, but not greater than necessary to hold Saracino accountable for his lifetime of crime.

<u>CONCLUSION</u>

For the reasons discussed above, the Court should sentence the defendant Saracino to a term of imprisonment of 100 years and to pay a forfeiture judgment in the amount of $1.4 million.

Dated: Brooklyn, New York
      May 15, 2013

                                        Respectfully submitted,

                                        LORETTA E. LYNCH
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Elizabeth A. Geddes
James D. Gatta
Cristina M. Posa
Assistant U.S. Attorneys
      (Of Counsel)