

U.S. Department of Justice

United States Attorney
Eastern District of New York

EAG/JDG
F. #2008R00530

271 Cadman Plaza East
Brooklyn, New York 11201

April 15, 2014

By ECF

Honorable Brian M. Cogan
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:    United States v. Dino Saracino
                Criminal Docket No. 08-240 (S-6)

Dear Judge Cogan:

        The government respectfully submits this letter in support of its request that the Court enter orders of restitution in the amount of $248,500 and forfeiture in the amount of $681,140 as to the defendant Dino Saracino.  The forfeiture amount is comprised of proceeds earned from the June 1995 robbery of Chemical Bank (alleged in racketeering act eight), the January 1996 burglary of S&B Suits (not alleged as a racketeering act), the May 1999 murder of William Cutolo (alleged in racketeering act thirteen) and the defendant's loansharking business spanning from 2002 to 2008 (alleged in racketeering act fourteen).[1]  The restitution amount is comprised of losses sustained by Chemical Bank (the successor to which is JP Morgan Chase Bank N.A. ("JP Morgan")) during the June 1995 robbery and by the estate of Richard Greaves following Greaves' murder in August 1995 (alleged in racketeering act nine).

---

[1] The amount of forfeiture sought by the government slightly varies from the amount noted in the government's sentencing memorandum as to Saracino to account for the fact that the government did not adduce evidence at trial that Saracino was a member of the charged enterprise at the time that his co-defendants' committed the 1991 robbery of Furs by Mina in Syosset, New York (alleged in racketeering act one).  This amount therefore does not include the proceeds obtained as a result of that robbery.

I.   Restitution In the Amount of $248,500 Is Warranted

   A.   Applicable Law

   When sentencing a defendant, who like Saracino has been convicted of a crime of violence, restitution to the victim of the offense or, if the victim is deceased, to the victim's estate is mandatory. 18 U.S.C. §§ 3663A(a)(1), (c). In the case of an offense resulting in death of a victim, restitution may be ordered payable to the victim's estate or his surviving heirs. 18 U.S.C. § 3663A(a)(2). Such restitution may include, among other expenses, funeral expenses, lost income and other expenses incurred by family members during the investigation and prosecution of the offense. See, e.g., 18 U.S.C. 3663(b)(2), (b)(3);[2] United States v. Serawop, 505 F.3d 1112, 1119-20 (10th Cir. 2007) (restitution includes "future lost income for victim of [murder]"); United States v. Razo-Leora, 961 F.2d 1140, 1146 (5th Cir. 1992) (affirming order that defendant pay $100,000 in lost income to victim's widow); United States v. Fountain, 768 F.2d 790, 800-804 (7th Cir. 1985) (upholding order directing defendant to pay restitution to victim's estate including medical expenses and lost income).

   B.   Analysis

   Restitution is warranted to reimburse JP Morgan and the estate of Richard Greaves. As noted in the PSR, Chemical Bank sustained losses in the amount of $210,000.[3] (PSR ¶ 534). Furthermore, Danny Greaves, Richard Greaves's brother, completed an affidavit in which he averred that he sustained $20,000 in lost income by Richard Greaves, $15,000 in funeral expenses and $3,500 in other expenses related to losses incurred during the investigation and prosecution of the offense. The government submits that the incurrence

---

   [2]   18 U.S.C. § 3663A(b) provides that the Court shall order that the defendant:

   (2) in the case of an offense resulting in bodily injury to a victim— (A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment; (B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and (C) reimburse the victim for income lost by such victim as a result of such offense; (3) in the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and (4) in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

   [3]   The PSR notes that "over $200,000" was taken from Chemical Bank. Police reports reflect that $210,000 was taken.

2

of such expenses is reasonable and supported by Greaves's affidavit. Notably, defense counsel has advised the government that he does not seek Danny Greaves's testimony to establish the restitution amount owed to him – although he may challenge the amount sought as lost income. Notably, when the defendant shot and killed Richard Greaves in August 1995, Richard Greaves was approximately 27 years old and planned to move to Arizona to open a pizzeria (Tr. 4258, 4261, 4266-67); at trial, the government introduced into evidence business records showing the incorporation of the pizzeria, Brooklyn's Best Inc. (GX 328(a-2) (attached as Exhibit A)). In connection with that business and other future employment opportunities, it is entirely reasonable that Greaves would have earned at least $20,000 over the course of his lifetime had he not been killed in August of 1995.[4] See Serawop, 505 F.3d at 1112 (affirming restitution award of $325,751 based on future lost income by three-month old whom the defendant was convicted of murdering by voluntary manslaughter). Similarly, funeral services and other expenses in the amount of $18,500, as Danny Greaves's set out in the affidavit he completed, are reasonable.

II.  Forfeiture In the Amount of $681,140 Is Warranted

The government respectfully submits that the Court should also enter an order of forfeiture in the amount of $681,140.

A.  Applicable Law

Under 18 U.S.C. § 1963(a)(3), a defendant who is convicted of 18 U.S.C. § 1962 is to forfeit "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962." So long as it was "reasonably foreseeable" to a defendant that "the racketeering enterprise in which he participated would engage in [such] activities," forfeiture of such proceeds is appropriate. United States v. Gotti, 459 F.3d 296, 347 (2d Cir. 2006) (citing United States v. Fruchter, 411 F.3d 377, 384 (2d Cir. 2005) (stating, in challenge to RICO forfeiture amount, that "[s]o long as the sentencing court finds by a preponderance of the evidence that the criminal conduct through which the proceeds were made was foreseeable to the defendant, the proceeds should form part of the forfeiture judgment")). To include the proceeds from a racketeering act in the total forfeiture judgment, there must be a preponderance of evidence that "the criminal conduct through which the proceeds were made was foreseeable to the defendant." Fruchter, 411 F.3d at 384 ("Although we have not previously considered whether proceeds derived from conduct forming the basis of a charge of which the defendant was acquitted can be counted as 'proceeds' of racketeering activity, it seems plain that they can." (citing United States v. Genova, 333 F.3d 750, 762 (7th Cir. 2003) ("The fact that Genova was acquitted of counts charging that he devoted the City's resources to his home-improvement projects does not

---

[4] Danny Greaves has also advised that he invested approximately $20,000 in Brooklyn's Best. Following Greaves's death, the pizzeria failed and Danny Greaves never recouped the money he invested in the business.

3

eliminate all possibility of a forfeiture based on these activities."); United States v. Edwards, 303 F.3d 606, 643 (5th Cir. 2002)).

  B. Analysis

    The evidence adduced at trial -- supplemented by the information set forth in the government's response to the defendant's objections to the PSR -- establish that the defendant and his coconspirators earned at least $681,140 in connection with their participation in the racketeering conspiracy, for which the defendant was convicted, all of which was foreseeable to the defendant. The government accordingly submits that the Court should also impose a forfeiture judgment in the amount of $681,140, which is comprised of the following:

| Amount | Evidentiary Support |
| --- | --- |
| $210,000 | Police reports reveal that the 1995 robbery of Chemical Bank in East Meadow, New York (see RA Eight; PSR ¶¶ 55-58) netted $210,000. |
| $9,000 | Police reports reveal that the 1996 burglary of S&B Suits in Farmingdale, New York netted in excess of $9,000. |
| $10,000 | Dino Calabro and Joseph Competiello testified, in sum and substance, that immediately following the murder of William Cutolo (see RA Thirteen; PSR ¶¶ 71-74), the participants (including Saracino) removed $10,000 in cash from Cutolo's person. |

| Amount | Evidentiary Support |
|---|---|
| $452,140 | Saracino's loansharking records, which were admitted at trial, establish that during the charged period Saracino had loaned a total of $870,000.[5]  (See GX 342 (attached as Exhibit B)).  In addition, David Gordon testified, in sum and substance, that he had borrowed loanshark loans from Saracino at an interest rate of two to three "points," which equates to two to three percent interest per week.  (See T. 2972-74).[6]  Utilizing a conservative one "point" figure to calculate the proceeds of Saracino's extortionate extension of credit results in interest payments to Saracino of $8,695 per week, or $452,140 per year.  Because the government does not possess evidence that the defendant's loansharking business provided a consistent rate of return for the duration of the charged period, the government seeks that this portion of the forfeiture money judgment should be based on a conservative estimate of Saracino's illegal proceeds for a single year. |

III.    Conclusion

For the foregoing reasons, the government submits that orders of restitution and forfeiture are warranted.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:    /s/_____
Elizabeth A. Geddes
James D. Gatta
Cristina M. Posa
Assistant U.S. Attorneys

---

[5]    The numbers on Saracino's loansharking records correspond to 1,000's.  That is, the entry of "3½" for Mush corresponds to $3,500 in outstanding loanshark loans.  The total amount of the entries is 869.5, which corresponds to $869,500.  (See Exhibit C).

[6]    Sebastian Saracino testified that at the time of Saracino's arrest in June 2008, Saracino had more than $500,000 in outstanding loanshark loans owed to him.  (T. 4352). Calabro similarly testified that Saracino had lent out "hundreds of thousands of dollars." (T. 1056).  Gordon testified Saracino had extended numerous loanshark loans between the mid-1990s and 2007 and as of 2008, Gordon alone owed Saracino $120,000 in outstanding loanshark loans.  (T. 2974-75).

5